**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MARIBETH HERRINGTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-09-0601 |
| | § | |
| UNIVERSITY OF TEXAS | § | |
| M.D. ANDERSON CANCER CENTER, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Maribeth Herrington has sued her former employer, the University of Texas M.D. Anderson Cancer Center, alleging violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* In her amended complaint, she alleges that she was discriminated against and subjected to a hostile work environment on the basis of her sex. She also alleges that after she complained, she was fired in retaliation. (Docket Entry No. 20-1). After discovery, M.D. Anderson moved for summary judgment. (Docket Entry No. 27). Herrington responded, (Docket Entry No. 31), and M.D. Anderson replied, (Docket Entry No. 32). Based on the pleadings; the motion, reply, and response; the summary judgment record; and the law, this court grants M.D. Anderson's motion and enters final judgment by separate order. The reasons are explained in detail below.

I.      **The Summary Judgment Evidence**[1]

Herrington is an architect who worked for M.D. Anderson in its capital planning and management department from 1999 until 2007.  After a promotion to the position of senior facilities project manager in 2003, Herrington's job was to facilitate construction projects at the hospital. (Docket Entry No. 27, Ex. 1A).  Among her duties was coordinating different construction teams working on the Interventional MRI Suite in the new Ambulatory Care Unit and serving as the liaison between the construction and design teams and the medical staff.  (*Id.* Ex. 3).  Her direct supervisor was Cecile Kraus, who served as the principal project manager.  (Docket Entry No. 31, Ex. 1, p. 26). Kraus began working in that position in August 2005.

In September 2006, Herrington complained to Kraus that she felt she was being treated less favorably than two male coworkers, Skip Davis and Bubba McCracken.  Herrington complained that Davis and McCracken were allowed more flexibility than she was in attending or coming on time to meetings and that they were allowed to interrupt Herrington in those meetings.  According to

---

[1]   The summary judgment evidence consists of excerpts from Herrington's deposition, (Docket Entry Nos. 27, Ex. 3; 31, Ex. 1) and errata (Docket Entry No. 31, Ex. 1A); internal e-mails (Docket Entry Nos. 27, Exs. 1B, 1C, 1D, 1E, 1F, 2A, 2C, 2D, 2E, 2H; 31, Exs. 3, 6, 7, 7A, 10, 11); an affidavit of Stuart Bernau, (Docket Entry No. 27, Ex. 1); an October 21, 2005 memo from Stuart Bernau, (*Id.*, Ex. 1A); and intent-to-terminate memo from Bernau to Herrington, (Docket Entry No. 27, Ex. 1G); an affidavit from Cecile Kraus, (*id.* Ex. 2);coaching and counseling interview–related forms, (Docket Entry Nos. 27, Exs. 2B, 2F; 31 Ex. 4); M.D. Anderson's equal employment opportunity complaint policy, (Docket Entry No. 1, Ex. 2); employee evaluations of Herrington, (Docket Entry No. 31, Ex. 5), and a coworker, (*id.* Ex. 8); printer logs, (Docket Entry No. 27, Ex. 2G); sample documents Herrington printed concerning her coworkers, (Docket Entry No. 31, Ex. 12); Herrington's responses to interrogatories, (Docket Entry No. 27, Ex. 5); Herrington's EEOC charge of discrimination, (*id.* Ex. 4); M.D. Anderson's response to the EEOC's inquiry regarding Herrington, (Docket Entry No. 31, Ex. 9); an unsworn statement from M.D. Anderson employee Richard Rokovich, (*id.* Ex. 13); EEOC guidance documents, (*id.* Exs. 14, 15).

Herrington has objected to the affidavits attached to M.D. Anderson's motion for summary judgment, arguing that portions of the affidavits are incompetent summary judgment evidence under Rule 56(e)(1) because they are beyond the scope of the affiants' knowledge.  (Docket Entry No. 30).  M.D. Anderson has responded by providing the basis for the statements and clarifying the limited purpose for which certain statements in the affidavits are offered.  (Docket Entry No. 32).  Rule 56(e)(1) requires that an affidavit "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  The affidavits and the response by M.D. Anderson show an adequate basis for the affiants' knowledge and this court has considered the statements only for the purposes outlined in M.D. Anderson's response, which are consistent with Rule 56(e)(1)'s requirements. Herrington's objection and motion are denied.

Herrington, Kraus responded that she had to "pick her battles" and that she was wary of taking action against Davis and McCracken because they were friends of Stuart Bernau, Kraus's supervisor. (Docket Entry No. 31, Ex. 1, p. 32).

On September 25, Kraus sent Herrington and the other project managers an e-mail about minimum standards of conduct at work. (*Id.* Ex. 2A). Kraus stated in her affidavit that the e-mail was primarily aimed at Herrington because she "had issues with attendance, being late to meetings, being unavailable during business hours and snapping or exhibiting unprofessional conduct with her co-workers." (*Id.* Ex. 2 ¶ 3). On September 29, Herrington attended a mandatory coaching and counseling session with Kraus. (Docket Entry Nos. 27, Ex. 2B; 31, Ex. 1, p. 45–46). According to Kraus, such sessions are held to inform employees about performance problems but are not disciplinary actions. (Docket Entry No. 27, Ex. 2, ¶ 4). Herrington testified in her deposition that this was her first such meeting. She attributed it to her complaint to Kraus about Davis and McCracken. (Docket Entry No. 31, Ex. 1, pp. 45–47).

Herrington met with Bernau and Kraus on October 18. At that meeting, Herrington gave them printouts of M.D. Anderson policies about equal-employment opportunity, confidentiality, attendance, and the work week. (Docket Entry No. 27, Ex. 1, ¶ 3). During the meeting, Herrington read the policies to Bernau and Kraus and told them she believed they had called the meeting in retaliation for her complaints about Davis and McCracken. Herrington reiterated her feeling that these coworkers received preferential treatment. (Docket Entry No. 31, Ex. 1, p. 47).

The next month, Janet Sisolak, who was in charge of the Ambulatory Clinical Building that contained the IMRI suite assigned to Herrington, forwarded Bernau a series of e-mails from M.D. Anderson medical staff. The e-mails complained about Herrington's handling of the project. (Docket Entry No. 27, Exs. 1, 1B). The chain of e-mails began with one from Herrington providing

3

a schedule for the IMRI lab construction.  (*Id.*).  In response, an M.D. Anderson doctor sent the following e-mail:

> If I did not know any better, I would say that this is a joke.  After three years of planning, and numerous delays, and horrible management of this project, this is the best you can do, 14 months of construction. . . . People make hospitals and faculty centers in that time period.
>
> Is anyone else in this group as outraged and frustrated as I am?  Does anybody feel that this project has taken at least 5 times if not 50 times longer than it should have.
>
> Please, please speak up and help me out here.

(*Id.* (ellipses in original, not emendations)).  Another participant in the e-mail chain wrote, "This is unbelievable. . .  It's also the closest thing to a formal update of the project status I've ever gotten (thanks)."  (*Id.* (ellipses in original)).

Sisolak forwarded the e-mails to Bernau and asked to "meet on Monday to discuss this mess."  (*Id.*).  Before this series of e-mails, Sisolak had received complaints from doctors that Herrington failed to respond to requests for a construction timeline.  (*Id.* Ex. 2D).  In this lawsuit, Herrington faults Sisolak for the delays in the IMRI Suite.  Herrington insists that she kept the "stakeholders" updated on the project status.  (Docket Entry No. 31, Ex. 1, pp. 144–46, 152).

On November 7, Kraus and Bernau decided to transfer Herrington's duties as project manager for  the IMRI Suite project to Lamar Singletary, who had been a project manager at M.D. Anderson for about a month.  Herrington asserts that she was instructed to retain only the duties of preparing agendas and minutes for the project.  (Docket Entry No. 29, Exs. 1 ¶ 6, 2 ¶ 6, 2E; 31, Ex. 1, p. 52–53).  Herrington alleges that this transfer was discriminatory and retaliatory, asserting that she was not aware of any other instance in her four years at M.D. Anderson of a female project manager being deprived of leadership on a project, having that role transferred to a male, and being

relegated to such subsidiary duties.  (Docket Entry No. 31, Ex. 1, pp. 67–68).  Kraus and Bernau respond that they decided to reassign the project because of the repeated and forceful complaints about Herrington's work on the project, including the delays, the failures to provide a timetable or schedule, and the failures to respond to requests for such information.  Kraus explained in her affidavit that she chose Singletary because, as a new employee, he had few projects and had the time available to devote to the work.  (Docket Entry No. 29, Exs. 1 ¶ 6; 2 ¶ 6).

On November 9, Herrington e-mailed Bernau to tell him that the new assignment "may not be according to MDACC Equal Employment Opportunity Policy V.A.2.0." and requested a meeting.  (*Id.* Ex. 1C).  Bernau met with Herrington on November 14.  After the meeting, he asked that she "provide [him] with a written document that states the violation and indicate the specific policy article that supports the violation."  (*Id.* Ex. 1 ¶ 7; 1D).  Herrington did not respond to this e-mail.  (*Id.* Ex. 1 ¶ 7).

The next day, at 8:24 a.m., Bernau sent Herrington an e-mail requesting copies of meeting minutes and agendas so that he could respond to complaints from doctors and others involved in the IMRI Suite project.  (Docket Entry No. 1E).  Bernau asked Herrington to provide the documents by 4:00 p.m. the next day.  (Docket Entry No. 31, Ex. 1A, pp. 14–15).  In response, Herrington provided 609 pages of meeting notes and agendas for the IMRI Suite project, but she does not contend that she produced any meeting minutes.  (*Id.*).

On December 5, Kraus and Herrington had another coaching and counseling interview.  (Docket Entry No. 27, Ex. 2F).  The memorandum provided to Herrington at this meeting outlined the results of Kraus's inquiry into the IMRI Suite problems, as follows:

> It has been brought to CPM's attention that the clients of the IMRI project are unaware of what is the true status of the project. . . .  The project team . . . verbally expressed that they did not receive[] formal

typed minutes or notes to be able to distribute them to the overall
client team during the past year.

After a lengthy review of the situation with the clients of the IMRI
project, it has been determined that project contacts have not received
any formal minutes.  The only products of the meeting were, meeting
notes that may or may not have been distributed.  This action has
resulted in the project team working in the verbal arena and not the
written arena when communicating with upper management.

Additionally it has been determined that the posting of meeting
minutes/notes on the CPM project electronic files in a timely manner
has not occurred.

(*Id.*).  The memorandum stated that "[f]ailure to comply with the Disciplinary Action Policy could

result in action up to and including termination."  (*Id.*).[2]

Herrington e-mailed Bernau the next day, telling him that she was sick and requesting a

"reasonable accommodation" to allow her to respond to the memorandum.  (Docket Entry No. 31,

Ex. 11).  The e-mail did not specify what accommodation she was seeking.  (*Id.*).  Herrington also

reminded Bernau that she expected him and Kraus to act according to M.D. Anderson's EEO and

nonretaliation policies.  (*Id.*).  Herrington did not specify any actions that violated the policies.

Herrington asserts that the discrimination and retaliation against her continued when, on

January 11, 2007, Kraus removed Herrington from another project.  Herrington had overseen the

frozen lab section exhaust modification and assigned it to two male coworkers.  (Docket Entry No.

31, Ex. 6).  Neither party has provided any evidence of the reasons for, or effect of, this

reassignment.

The final conflict between Herrington and her supervisors occurred after Herrington accessed

information about other employees on an electronic database.  On January 16, Herrington received

---

[2]   Although Herrington describes the allegation that she did not provide meeting minutes as "totally false" in her
response, she claims to have provided only notes and agendas, not minutes.  (Docket Entry No. 31, p. 7).

6

an e-mail with the subject line "SharePoint Site: http://utmcprproint/PPM/pcf" that read:

> A web private web folder for Mari Herrington has been created.  The only users who can access this folder are the PPM, Mari, Stuart Bernau and Penny Murdock.
>
> Richard G. Rokovich (D_UTMFM/rgrokovich) has granted you access to http://utmcpmprojnt/PPM/pcf/Mari_Herrington/Forms/-AllItems/aspx.
>
> Click the link to view the list.
>
> You have been granted access to the list with the following permissions: View, insert, edit, delete items.

(Docket Entry No. 31, Ex. 3).  Herrington accessed the list on January 23.  When she clicked the link in the subject line, she received a "page not found" message.  Following the link in the body of the e-mail took her to the SharePoint site.  This site was intended to provide capital planning and management employees access to department-wide information and to give each individual employee access to his or her own personnel files.  (Docket Entry No. 27, Ex. 2, ¶ 9).  Besides that individual employee, the only employees who were to have access to personnel files were Kraus, Bernau, and another M.D. Anderson employee, Penny Murdock.  (*Id.*).  Because of a problem with the security settings, however, any employee with access to the site could access personnel files of other employees.  (*Id.*).

Kraus stated in her affidavit that she discovered Herrington had printed the documents after she received a report that Herrington's print volume was preventing other employees from being able to print documents themselves.  (Docket Entry No. 27, Ex. 2 ¶ 9).  Kraus requested printer logs that showed the names of the 149 documents Herrington had printed from this site.  (Docket Entry No. 27, Ex. 12).  According to Kraus, the documents included the candidate-assessment form of Singletary, who replaced Herrington on the IMRI project, and nine coworkers' scheduling logs,

7

which Kraus used for employee evaluations.  According to Kraus, Herrington had no managerial responsibilities that would require—or make it appropriate for—her to review these and similar documents about other employees.  (*Id.* Ex. 2 ¶ 9).

Herrington admits printing the documents and has provided examples of them.  (Docket Entry No. 31, Ex. 12).  Herrington justifies her actions by asserting that the e-mail from Richard Rockovich, the employee who was apparently responsible for establishing the site, gave her permission to access the documents.  Herrington explains that she wanted to use the documents to support her complaint with the human resources department.

The parties disagree about whether the documents were kept confidential.  Herrington asserts that members of the public could access the personnel files through freedom-of-information requests; the defendants vigorously deny that private information about employees could be obtained by other employees.  The documents Herrington downloaded and printed contain obviously sensitive personnel information about other employees, of a nature that is protected as confidential and private.

On discovering what documents Herrington was printing, Kraus sent her an e-mail dated January 24, 2007 with the subject line: "PCF Share Point Site."  The e-mail read:

> Mari,
>
> It has been brought to my attention that you have accessed confidential information off the referenced site.  This is unacceptable. This information was not meant for public employee viewing as the files were identified as Employee Evaluations, Candidate Assessment and Disciplinary Action.  Any information that you have downloaded or printed from this site needs to be brought to me or Stuart by 4pm today January 24, 2007 to be destroyed.
>
> At this time we have locked the site down so this will not happen again in the future.

(Docket Entry No. 27, Ex. 2H).

Bernau and Kraus visited Herrington in person that same day to request the documents she had accessed.  Herrington maintained that she did not have the documents they were looking for. After that meeting, Bernau sent Herrington the following e-mail:

> Mari,
>
> As you know from Cecile's email to you (under the confidential stamp) dated 1/24/2007 with the subject line of "PCF Share Point Site" that some of her staff's project performance files were not secure from viewing, downloading (re-saving) and/or printing.  The noted site within her email is the one in the screen shot below.
>
> These directories and files contain the staff's individual 1:1 meeting minutes, progress logs, candidate assessments, project status and other misc. PM products documents.  All of which, you are familiar with as they are used during your 1:1 and project meetings with Cecile.
>
> The security mistake has been corrected.  The only open issue is that of what files, if any, were downloaded (re-saved) and/or printed from the site by you.
>
> In absence of a response by you to your manager's email, I had to determine the status of this open issue with you in person.
>
> The result of our verbal conversation was that you indicated you had not downloaded (re-saved) and/or printed any files from this site.  My and Cecile effort was to ensure confidence that the staff's files had not been compromised.
>
> This is a very important issue and if any of this email is incorrect, please inform me asap.
>
> thanks.

(Docket Entry No. 27, Ex. 1F).

In a memorandum dated January 26, Bernau told Herrington that he intended to fire her for "dishonesty, failure to cooperate and breach of confidentiality which is in violation of M.D.

9

Anderson policy" because she had print out the documents that contained confidential information about other employees and refused to surrender those documents when asked.  (*Id.* Ex. 1G).

Herrington maintains that she was not dishonest.  She emphasizes that Kraus and Bernau only asked her for documents from the "PCF site" that were printed on January 24.  She admits in this lawsuit, but did not tell them when asked at the time, that she accessed a related website the day before, January 23.  She asserts in this lawsuit that she did not breach confidentiality because she simply followed the instructions to log in and discovered the documents on the website she accessed by doing so.  She explained her position in her deposition:

> I did not access the PCF website and I did not access it on the 24th.
>
> Q.     But you did access a website and you did print the documents that they—that Cecile had asked you for, so why didn't you just tell them no, I didn't access the PCF, but I did access this other website.  Richard, you know what I'm talking about because you helped me log in, and there were these documents.  Why didn't you just tell them—
>
> A.     I—cause I was in a hostile work environment. . . .  I was truthful with the answers that I gave.

(Docket Entry No. 31, Ex. 1, p. 122).

On September 25, Herrington filed a charge with the EEOC.  (Docket Entry No. 27, Ex. 4).

Herrington marked the boxes to indicate sex discrimination and retaliation.  (*Id.*).  The charge reads:

> I.     On September 29, 2006 and again on November 9, 2006, via email, I complained to Mr. Stuart Bernau, Manager of Project Management, regarding discrimination in the work place.  Specifically, I complained about having several of my projects given to other male Architect.  On January 26, 2007, I was discharged from my position as Senior Project Manager.  The Repondent is in the medical industry and is covered by Title VII of the Civil Rights Act of 1964, as amended.
>
> II.     The only reason given for my termination was that I accessed a web site known as Sharepoint.  I was provided information

10

> regarding this web site by Mr. Bernau and advised to access the web site. No specific reason or instructions were given as to why I should access the web site or what I was to do once I gained access. To the best of my knowledge, there were no performance related issues. I was replaced by a male employee who was hired to facilitate a FEMA project.
>
> III.    I believe I was subjected to discrimination due to my sex, female, and in retaliation for complaining of issues covered by Title VII, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id.*).

Herrington asserts that the defendants' proffered reason for terminating her was pretextual and that she was the victim of sex discrimination and retaliation. The defendants respond that the reason was legitimate and that Herrington has failed to raise a fact issue as to pretext or a violation of Title VII. The arguments are analyzed below.

## II.    Analysis

### A.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402

11

F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir.  2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir.  2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## B.    Sex Discrimination

Under Title VII, it is unlawful to "discharge any individual, or otherwise to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1); *Smith v. Xerox Corp.*, 602 F.3d 320, 326 n.4 (5th Cir. 2010).  The law also prohibits retaliation for protected activities.  42 U.S.C. § 2000e-3(a); *Smith*, 602 F.3d at 326 n.5.

Disparate treatment, or intentional discrimination, can be proven by either direct or circumstantial evidence.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).  Evidence is "direct" if it would prove the fact in question without inference or presumption.  *Fabela*

*v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted).  To serve as direct evidence of an employer's discriminatory intent, a workplace comment must be "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [sex] was an impermissible factor in the decision to terminate the employee."  *EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996) (citing *Bodenheimer v. PPG Indus. Inc.*, 5 F.3d 955, 958 (5th Cir. 1993)).

It is not clear whether Herrington argues that Kraus's response to Herrington's complaints about treating Davis and McCracken is direct evidence of discrimination.  Understood in the light most favorable to Herrington, Kraus's comment that Davis and McCracken were friends with her boss, Bernau, is not direct evidence.  The statement, on its own, most directly suggests that Kraus did not want to discipline Davis and McCracken because she did not want to offend her supervisor by disciplining his friends.  Concluding that the statement suggested sex-based discrimination would clearly require an inference by the jury.  *Cf. Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 273 (5th Cir. 2006) (per curiam) (unpublished) (finding no direct evidence of race discrimination despite evidence that a supervisor stated that he wanted to "get rid of all the blacks" and "fire a bunch of niggers" because although these comments revealed the supervisor's discriminatory animus, they "lack[ed] the indicia of specificity and causation required to be direct evidence of race discrimination.").

Cases with no direct evidence proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).  Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a prima facie showing of sex discrimination.  *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid*,

13

376 F.3d at 312.  A plaintiff satisfies this burden by showing that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated differently from those outside the protected class.  *See Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *see also Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005) ("To establish a prima facie case of discrimination under § 1981, Appellants must establish that the: (1) are members of a protected group; (2) were qualified for the position held; (3) were discharged from the position; and (4) were replaced by persons outside of the protected group.").  If a plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision.  *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006).  If a defendant can produce such evidence, the presumption of discrimination dissolves.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).  The plaintiff must then identify or offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)."  *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); see also *Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).  In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  *Rachid*, 376 F.3d at 312.  The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated against her on the basis of the plaintiff's membership in the protected class.  *Reeves*, 530 U.S. at 143.

14

Under Fifth Circuit precedent, "only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating" qualify as adverse employment actions that may be the basis for a successful sex-discrimination claim. *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)). The Fifth Circuit has cautioned courts "not to expand the definition of adverse employment action to include 'events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything that might jeopardize employment in the future.'" *Roberson v. Game Stop/Babbage's*, 152 F. App'x 356, 360 (5th Cir. 2005) (quoting *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997) (per curiam) (unpublished). Under this standard, the coaching and counseling interviews Herrington received are not adverse employment actions. *Id.* There is no evidence in the record that the meetings led to disciplinary actions. Similarly, her diminished role in the IMRI Suite project and her removal from the frozen lab section exhaust modification are not adverse employment actions. *Bubolts v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008) (noting that "minor changes in duties or working conditions, even unpalatable or unwelcome ones, [that] cause no materially significant disadvantage" are not adverse employment actions that give rise to an employment-discrimination claim); *Higgins v. Gonzales*, 481 F.3d 578, 585 (8th Cir. 2007) (removal from a project without a decline in prestige or benefits, is not an adverse employment action in a race-discrimination case); *Belt v. Ala. Historical Comm'n*, 181 F. App'x 763, 764–65 (11th Cir. 2006) (holding that "minor changes to [the plaintiff's] job duties, including requiring that she provide her ferry and fort admission reports to her supervisor rather than transmit them directly to the Montgomery office and temporarily removing her duty to order gift shop inventory" were not adverse employment actions); *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213–14 (10th Cir. 2003) (same); *cf. Walker v. Thompson*, 214 F.3d 615, 629 (5th

Cir. 2000) (removal of a major account from an employee was not an adverse employment action for a Title VII retaliation claim before *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)), *abrogated on other grounds by Burlington*, 548 U.S. 53 (holding that adverse employment actions for the purposes of Title VII retaliation need not be as severe as in Title VII discrimination claims); *Hale v. Napolitano*, Civ. A. No. SA-08-CV-106-XR, 2009 WL 1507144, at *6 (W.D. Tex. May 28, 2009) (removal from a project, along with other actions, was not enough to show an adverse employment action under the post-*Burlington* standard for Title VII retaliation). Herrington has provided no evidence suggesting that the changes to her work assignments resulted in lower compensation, lower prestige, or prevented her from obtaining other work.

Although Herrington's job termination was an adverse employment action, there is no prima facie showing or disputed fact issue of disparate discipline. Herrington was fired after downloading and printing personal information about her coworkers. The printer logs provided Bernau and Kraus evidence of Herrington's actions. Herrington admits that she printed the documents that led to her termination. When asked about the documents, she denied having them. Herrington's denial was not based on the substance of the questions she was asked but on narrow details of the way they were asked. There was a discrepancy between the name of the electronic file from which she obtained the documents and the name of the file she was asked about. There was a discrepancy between when she copied the documents (January 23) and the date she was asked about (January 24). The record shows that Kraus and Bernau were clearly seeking the documents that she had copied. Kraus's e-mail to Herrington asked for "files . . . identified as Employee Evaluations, Candidate Assessment and Disciplinary Action." When Kraus and Bernau asked questions clearly intended to obtain information about the documents and require Herrington to return them, she did neither. Even if she did not "lie" because of the way the questions were asked, she was at a

16

minimum uncooperative.  Indeed, she was dishonest by any objective measure except the most technical.

There is no evidence in the record suggesting that M.D. Anderson acted without a reasonable basis to believe that Herrington had documents with confidential information about other employees and was refusing to return the documents.  There is no evidence in the record suggesting that M.D. Anderson faced a similar issue with a male employee and acted differently.  *See Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (internal quotations and alterations omitted) (in disparate treatment cases involving employee misconduct and discipline, a "plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees."); *see also Berquist v. Wash. Mut. Bank*, No. 05-20956, 2007 WL 2007333, at *7 (5th Cir. Jul. 12, 2007) ("In disparate treatment cases, the plaintiff-employee must show 'nearly identical' circumstances for the employees to be considered similarly situated." (quoting *Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 210 (5th Cir. 2004)).

Herrington's insistence that she was honest in denying that she downloaded, printed, and retained documents containing personnel information about other employees, and in denying that the documents were confidential, does not provide a prima facie showing of disparate discipline or raise a fact issue.  First, as noted, Herrington's denial was not based on the substance of the questions she was asked but on narrow details of the way they were asked.  Second, the documents obviously included confidential personnel information about other employees.  The fact that Herrington was able to obtain the documents did not make it reasonable for her to conclude that it was proper for her to do so or that the documents were open to be read, copied, or disseminated.

Finally, even if Bernau and Kraus were wrong to conclude that Herrington had lied about downloading and copying the documents or that it was improper for her to do so, that does not show that the reason for her termination was false.  "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995); *see also Bryant v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (disregarding the plaintiff's claim of innocence because no evidence called into doubt the employer's good-faith suspicion that the employee stole from the employer).

Even assuming that Herrington made a prima facie showing of discrimination in her removal from the project manager role and her job termination, M.D. Anderson's nondiscriminatory explanation meets its burden.  The summary judgment record does not give rise to a fact issue as to whether this explanation was pretextual or whether discrimination was the reason for Herrington's termination.  A pretextual reason for termination means that "discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision," *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 223 (5th Cir. 2000) (quoting *Reeves,* 530 U.S. at 147).  A court must "consider 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case" to determine whether there is a fact issue as to pretext.  *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir. 2000) (quoting *Reeves,* 530 U.S. at 148–49)).  The record presents insufficient evidence from which a jury could conclude that the explanation was pretextual or that discrimination was a motive for transferring job duties from Herrington or firing her.  As to the removal from the IMRI Suite project, the undisputed evidence  shows that Kraus and Bernau had received significant complaints about Herrington's

18

work.  The record shows no fact issue as to disparate discipline with respect to Herrington's removal from the IMRI Suite project and the reassignment to a male employee with time to do the work.  The record discloses no evidence that a male employee with similar performance complaints was treated differently.  With respect to her job termination, in addition to the problems in performance, Herrington did in fact access a website that contained clearly confidential information about other employees and printed numerous documents from that website.  When asked about it, she seized on slight discrepancies between what she was asked and what she did and denied that she had downloaded and printed the documents.  There is no evidence of any similar misconduct treated less harshly for a male employee.

In her deposition, Herrington stated that the only basis for her belief that Kraus's actions were discriminatory was a conversation on September 5, 2006, in which Kraus said that she did not want to take  action to make two of Herrington's male coworkers, Davis and McCracken, stop interrupting Herrington at meetings and come to meetings on time because these two were friends with Bernau and Kraus wanted to "pick her battles."  (Docket Entry No. 31, Ex. 1, p. 32).  This comment does not rise to the level of a remark that can support an inference of discrimination.  To the contrary, this alleged comment shows at most a desire to avoid offending a supervisor by reprimanding people who were his friends, not a desire to favor male over female employees.  Herrington also admitted in her deposition that she did not know whether Kraus had talked to Davis and McCracken about their behavior.  Kraus's remark does not show sex-based animus and even if it did, would not suffice to survive summary judgment absent other evidence.  *See Cooper v. Wal-Mart Transp., LLC*, 662 F. Supp. 2d 757, 799–90 (citing *Phillips v. TXU Corp.*, 194 F. App'x 221, 228 (5th Cir. 2006)).

The record does not raise a fact issue as to whether Herrington's job termination, the only

19

action that qualifies as an adverse employment action for the purpose of her sex-discrimination claim, was "because of" her sex.  Summary judgment is granted as to this claim.

### B.     Hostile Work Environment

Herrington also alleges that she suffered a hostile work environment at M.D. Anderson.  The elements of a sexually hostile work environment claim are that the plaintiff was (1) subject to unwelcome harassment (2) based on her sex that (3) affected a term, condition, or privilege of employment, and (4) that the employer knew or should have known of the harassment but failed to take prompt remedial action.  *Reine v. Honeywell Int'l Inc.*, 362 F. App'x 395, 397 (5th Cir. 2010) (citing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 393, 393 & n.2 (5th Cir. 2007)).

To be actionable, a work environment must be both subjectively and objectively hostile. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).  Whether a work environment is objectively hostile depends on the totality of the circumstances; "workplace conduct is not measured in isolation."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001); *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).   Relevant circumstances may include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  Title VII is not a "general civility code," and employees must tolerate the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations and quotations omitted).  Only when conduct is "so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace" can a plaintiff get relief under Title VII. *Shepard v. Comptroller of Pub. Accounts of the State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999) (quoting *Weller v. Citation Oil & Gas Corp*, 84 F.3d 191, 194 (5th Cir. 1996); *see also Burlington*

20

*Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) (requiring "a showing of severe or pervasive conduct" for a hostile environment claim).  For example, a continuing pattern of hostile comments unrelated to work survives survive summary judgment; evidence of sporadic work-related criticisms does not.  *Compare EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400–01 (5th Cir. 2007) (holding summary judgment was not warranted when a Muslim employee alleged that coworkers called him "Taliban" multiple times a day, called him "Arab" though he was Indian, and mocked his religious beliefs and practices, and that a supervisor wrote that he was "acting like a Muslim extremist" in an official reprimand), *with Kang v. Bd. of Supervisors of La. State Univ.*, 75 F. App'x 974, 976–77 (5th Cir. 2003) (summary calendar) (holding that unjustified criticisms of an employee in front of coworkers does not as a matter of law create a hostile work environment).

The actions Herrington complains about do not, as a matter of law, create a hostile work environment.  Her male coworkers' rudeness in interrupting her at meetings and the fact that they were allowed to attend fewer meetings or come in later than she was are the sorts of slights that are not actionable as a matter of law.  There is no evidence that the coaching and counseling interviews were conducted in an abusive manner.  *See Kang*, 75 F. App'x at 976–77.  There is no evidence that would allow a reasonable jury to conclude that Herrington's removal from two projects was done in a way that would create a hostile work environment, alone or in combination with the other allegedly hostile activities.  Moreover, the record presents no evidence that would allow an inference that any workplace hostility was because of Herrington's sex.  Herrington's hostile-work-environment claim fails as a matter of law.

### C.    Retaliation

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this

21

subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *McCoy*, 492 F.3d 551, 556–57; *Septimus v. Univ. of Houston*, 399 F.3d 601, 607–10 (5th Cir. 2005). For the purpose of a retaliation claim, an "adverse employment action" is defined as an action that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (2006) (internal quotations omitted).

Even assuming (without deciding) that Herrington's vague requests between September and December 2008 that Kraus and Bernau follow M.D. Anderson's EEO and nonretaliation policies constitutes protected activity under § 2000e-3, Herrington's retaliation claim fails. A close temporal proximity between protected activity and an adverse action may suffice for a prima facie case. But once the defendant proffers a nonretaliatory reason for the action, the plaintiff must come forward with more to avoid summary judgment. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 487 (5th Cir. 2008); *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007); *Roberson v. Alltel Info. Svcs.*, 373 F.3d 647, 655 (5th Cir. 2004); *Swanson v. GSA*, 110 F.3d 1180, 1188 (5th Cir. 1997).

M.D. Anderson has proffered the following nondiscriminatory and nonretaliatory reasons for its actions: poor performance for the coaching and counseling interviews and removal from projects; and dishonesty, refusal to cooperate, and accessing other employees' information for the job termination. Although Herrington vigorously contests whether she was dishonest about the documents she downloaded and printed before her termination, her own belief in her honesty does

not raise a disputed fact issue as to pretext or motive.  The record discloses no evidence to support

an inference that the proffered reasons for the challenged actions are untrue.  Nor does the record

support an inference that Kraus or Bernau was motivated by a desire to retaliate for Herrington's

statements to them.  *See Strong*, 482 F.3d at 807–08 (distinguishing *Shirley v. Chrysler First, Inc.*,

970 F.2d 39 (5th Cir. 1992)).  To the contrary, Bernau responded that Herrington's statements about

discrimination and the violation of M.D. Anderson policy raised a "very serious issue" requiring "an

immediate response," and specifically asked her for a "document that states the violation and

indicate[s] the specific policy article that supports the violation."  (Docket Entry No. 27, Ex. 1D).

Herrington's Title VII retaliation claim fails as a matter of law because the record shows nothing

beyond temporal proximity to support the claim.

## IV.  Conclusion

M.D. Anderson's motion for summary judgment is granted.  Final judgment is entered by

separate order.

SIGNED on November 24, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge